UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                                CRIM. CASE NO. 12-20667

v.                                                 PAUL D. BORMAN
                                                      UNITED STATES DISTRICT JUDGE

FAHED HAMAD,

      Defendant.
_____/

**ORDER DENYING DEFENDANT FAHED HAMAD'S MOTION TO SUPPRESS
TELEPHONES SEIZED FROM RESIDENCE AT TIME OF ARREST**

After receiving briefing by the Parties, the Court held an evidentiary hearing that stretched over three days. Thereafter, the Court permitted the parties to submit a supplemental brief.

Having reviewed all of the evidence, the Court concludes that the agents did not violate Defendant's Fourth Amendment rights in seizing the phones.

**<u>Testimony at the Hamad Hearing: First Day, Thursday, April 25, 2013</u>**

The Government first called Alcohol Tax Firearms Explosives (ATFE) Special Agent Michael Bolf. He testified that the agents received a briefing before proceeding to the house on Winthrop, to arrest Defendant. Hearing TR. April 25, 2013, Bolf, P.10. Bolf didn't recall the specifics of the briefing, or even know why Defendant was being arrested. TR. P.11. He did recall that he was told at the briefing that Defendant was on parole. TR. P.12.

Bolf testified that seven Task Force law enforcement personnel were initially sent to the

Winthrop location. P.11. Bolf went to the front door, but when the agents made contact with the Defendant at the side door, he went to the side of the house. P.14.

After being handed a baby that had been inside the house and was carried to the door by a male occupant, he transferred the baby to a civilian female. Bolf entered the house, went to the kitchen, and saw some phones on the kitchen counter. The arrest target Defendant Hamad was standing within a few feet of the kitchen. TR. P.17. Bolf asked Defendant if the phones were his. He said "yes." Bolf followed up asking Defendant if he had the phone charger, and Defendant said "yes", and that it was in the back bedroom. TR. P.18.

Bolf seized the two phones Defendant identified as his from the kitchen counter, and then the charger from the bedroom floor next to the bed. TR. 19.

Bolf testified that he took the phones to the Dearborn Police Department. Bolf had initially asked Defendant Hamad for consent to search the phone at the station, and received a signed consent form (as he did with other defendants seized that day), but couldn't access the phones because the computer he was going to use to examine the phones malfunctioned. TR. P. 23. Thereafter he procured judicially authorized search warrants for all the phones. TR. P.22. Bolf testified that while at the station he destroyed the consent forms because the computer malfunctioned, and he was going to seek search warrants for the phones.

On cross-examination, S.A. Bolf testified that when he entered the house, Defendant Hamad was situated in handcuffs near his phones. TR. P. 38. Bolf was the forensic collection agent for the phones; he had asked Defendant to identify his phones. TR. P. 40. Bolf further testified that he did not prepare any type of inventory report regarding his collection of the many phones that evening. TR. P. 42.

On redirect, S.A. Bolf could not recall whether at the pre-arrest briefing he was told of the importance of the phones regarding the case. TR. P. 45. Bolf further testified that he realizes now that he should not have destroyed the consent forms signed by the Defendants at the police station. TR. P. 46.

The second witness was Task Force Agent (TFA) Steven Faith, a Dearborn Police Officer serving on the Task Force. Faith, TR. 47. TFA Faith did not remember what was said at the pre-arrest briefing. TR. P. 48. At the Winthrop address, Faith, after hearing movement in the house, a struggle in the backyard, and no one responding to a knock at the front door, opened the side door (no force was required), identified his group as police, and went in, up the stairs to the kitchen. TR. Pp. 49-51.

Faith saw multiple persons in the house, and ordered them all into the living room for safety reasons, until clarifying what was occurring in the back yard and the house. TR. P. 52-53. Another Task Force Agent present at the house identified Defendant Hamad, who was in the living room group. TR. P. 54.

On cross-examination, TFA Faith testified that there was a knock and announce on the front door and the side door prior to entry, TR. P. 57, that he was present when Defendant Hamad was arrested in the house, but did not remember if any phones were found on his person. TR. Pp. 61-62.

The third government witness ATFE S.A. Mark Ratliff, testified that when the side door was opened, after hearing yelling at the back of the house regarding an attempted escape, the agents called the people out of the house, and after people exited, the agents entered to "clear" the house. Ratliff TR. Pp. 65-66. Ratliff testified that he didn't know if some people were still

3

left in the house when he entered. The agents quickly directed the outside people back into the house because it was cold outside. TR. P. 68. When "everyone was settled down", the agents identified Defendant as the subject of the warrant.

S.A. Ratliff testified that he did not know where Defendant was located before he first saw him. Ratliff was designated to take Defendant outside to a Dearborn Police car. TR. Pp. 70-71.

On cross-examination, S.A. Ratliff could not identify the individual who came outside as the side door was opened. Defense counsel asked S.A. Ratliff:

> Q. . . . "before you go in the house for the first time people were called out and <u>some</u> people came out of the house; is that correct?
>
> A. I can't remember that."

TR. P. 77. (emphasis added) S.A. Ratliff could not say whether the skinny man without shoes who was taken outside the house, and the Defendant, who has tattoos, are the same person. TR. 80. The Government then rested.

The Defendant called ATFE co-case agent Richard Jury. Jury was not present at the Winthrop address. Jury was questioned about an ATFE Property Status Summary Report, presumably prepared by S.A. Buyse, that stated that the two phones were taken from Defendant Hamad's person. Jury TR. Pp. 86-88. Jury responded that this was incorrect; that he later found out that they were recovered from the kitchen counter. TR. P. 88.

**Second Day, Friday, April 26, 2013**

The Defendant called ATFE Michael Coleman, who testified that from his vantage point at the Winthrop address, he saw one male asked to come out of the house and taken into custody. He also saw S.A. Ratliff take a baby out. Coleman did not remember if Defendant was the

person ordered out of the house. Then the entry team "cleared the house." Second Day TR. Coleman, Pp. 26-27, 30.

The Defendant then called ATFE S.A. James Soper, who testified that he came over after a prior arrest, to assist at this location. Upon arrival, he was informed that someone inside the house had tried to jump out from the back of the house when the team arrived. Second Day TR. Soper, Pp. 31-32. Soper testified he saw some people being escorted out of the house, and then escorted back in. TR. Pp. 33, 36.

**Third Day, Monday, April 29, 2013**

The Defendant called ATFE S.A. Sheila Clifton, who was the group supervisor for the arrest team at Defendant's address on 7768 Winthrop. S.A. Clifton testified that there was a general pre-arrest briefing for all the arrest teams, and then a specific briefing for each team. Third Day TR. Clifton, P. 6. She testified that she did not generate a report about her activity the day she went to the Winthrop location. Since her vantage point was the front of the house, she could not initially see the side. When she heard voices from the side she assumed contact had been made with someone at the side, so she proceeded to the side door where she saw three children and 4 males, either outside the house or in the kitchen area. TR. Pp. 9-12. The male was holding a small baby; at one point she held that baby outside of the house. TR. Pp. 12-13. S.A. Clifton did not recall whether she first saw Defendant inside the house, or before she went into the house. She did not see Defendant get handcuffed, nor does she have any knowledge of who handcuffed him. TR. Pp. 12-13. S.A. Clifton testified that she does not know if the phones were taken from his person. TR. P. 15.

On cross examination from the prosecution, S.A. Clifton testified that she had been

5

briefed, prior to the raid, by S.A. Buyse, who told them to seize the arrestees' cell phones; S.A. Bolf was tasked with seizing the cell phones. TR. P. 16. S.A. Clifton further testified that the first time she saw Defendant Hamad was in the living room area, very close to the kitchen. TR. P. 16.

ATFE Special Agent Richard Buyse was the second witness called by the Defendant on Monday, the third day of the hearing. He testified that he was never at the arrest location of Defendant Hamad, 7768 Winthrop; his first contact with Defendant was at the Dearborn Police Department later that day. S.A. Buyse, TR. P. 20.

S.A. Buyse testified that he had learned that several cell phones had been seized during the execution of the arrest warrant, and that this information about the phone seizure was relevant and important in terms of his investigation. TR. Pp. 22-23. Specifically, S.A. Buyse, who conducted the pre-arrest briefing, testified:

> Q. And as part of that preraid briefing, did you tell the officers for all the teams that you wanted the cell phones seized?
>
> A. I did.
>
> Q. And why did you tell them that?
>
> A. We were aware that cell phones had been used during the robbery, the day of the robbery, to communicate with all the suspects. They were using them to communicate with each other. So we wanted those phones for that reason.

TR. P. 24.

S.A. Buyse further testified that after the raids, he secured search warrants for the phones seized during the arrests of four Defendants. The "contents" of the cell phones were not examined until after securing the search warrants. TR. P. 25.

S.A. Buyse testified that at the preraid briefing he did not tell the agents to search the

house for the phones, but "when someone is arrested, if they have their phone with them, 'those phones will be taken into custody for our evidence.'" TR. P. 26.

The next witness called by Defendant was Lieutenant Issa Shahin, of the Dearborn Police Department. He was excused after testifying that he was not present at the Winthrop address on the day of the raid.

The next witness called by Defendant was Dearborn Police Officer Christopher Taite who was present at the Winthrop arrest. Taite testified that he was not part of the original Winthrop team, that he arrived there after conducting an arrest at another Defendant's house. He testified that when he got to Winthrop he stood on the sidewalk and saw Defendant being walked out of the house in handcuffs and placed in his squad car, at which point he transported him to the Dearborn Police Station. Taite, TR. P. 35.

The final witness was Defendant Hamad. He testified that he resided at 7768 Winthrop in Detroit with his wife and three children, ages 3, 2, and 10 months (3 months at the time of the arrest). Hamad, TR. Pp. 39-40.

He testified that at 8a.m. on October 12th, his wife Angelita was not home. Present at the Winthrop address, in addition to himself and the children, were adult males Ali Ibrahim Aoun, Mutalla Sabbea Al-Saddoon, and Richard Vega. TR. Pp. 41-42. After hearing a knock on the front and side doors, he went to the side door with his three children, holding the youngest, encountered the police, exited the house with the three kids, and closed the door. Hamad testified that S.A. Clifton took the baby, he was placed in handcuffs, and then he and the two remaining young children, who were holding on to his pants, were taken back in the house. He testified that an officer asked him where are your phones; he said in the bedroom under or on a pile of clothes,

7

connected to their chargers. TR. Pp. 45-46. Hamad testified that the phones were not on the kitchen counter. Hamad further testified that he was not advised of his right to remain silent at his house or later at the Dearborn Police Station. TR. P. 46. However, he did later testify that after being shown an advice of rights form, he did sign it at the police station.

On cross-examination by the Government, Defendant Hamad testified that co-Defendant Vega was his wife's uncle, and that he, Hamad, was on parole at the time of the arrest. TR. P. 50. He further testified that at the time of his arrest, Vega was living in a first floor bedroom, and Aoun and Al-Saddoon were in the basement, along with another male Ali. TR. P. 59.

**Legal Discussion**

In *Chimel v. California*, 89 S.Ct. 2034 (1969) the Supreme Court held that a search incident to arrest can only include the arrestee's person and the area within his immediate control – the area from within which he might gain possession of a weapon or destructible evidence. The Court elaborated on this "area" in *Arizona v. Gant*, 129 S.Ct. 1710, 1716 (2009):

> That limitation which continues to define the boundaries of the [4th Amendment] exception, ensures that the scope of the search incident to arrest is commensurate with its purposes of protecting arresting officers and safe-guarding any evidence of the arrest that an arrestee might conceal or destroy.

A logical reading of these words would cover the area close to the arrestee.

The Court has heard the testimony of many witnesses and finds credible the following facts:

> (1) the testimony that Defendant was arrested with 3 children near the side door of his house, and taken into the kitchen/living room area;

(2) that just before he opened the door and was seized there was a disturbance when Defendant Vega tried to run out of the back of the house;

(3) that there were multiple adult male occupants in the house; four adults and three children;

(4) that it was necessary to "clear" the house and to have all the occupants, including the two children in the living room/kitchen area in order to determine who was being arrested and to take steps to make sure the young children would be safe and secure;

(5) that the Defendant's phones were on the kitchen counter;

(6) that the Defendant's phones were in plain view and near Defendant Hamad;

(7) that the agents had probable cause to seize the phones as evidence of the crime based on S.A. Buyse's knowledge of the robbery and his explanation of those facts and reasons at the briefing.

The Court finds inherently incredible Defendant Hamad's testimony that he came outside with the three small children and closed the door when the police first encountered him. Given the co-Defendant Vega's escape escapade at the back of the house just before Defendant opened the door, and the fact that there was a lot of noise coming from the house. The Court concludes that there is "no way" the police would have let him close the door of the house when they first encountered him, since the house was still likely full of potential confederates, potentially armed

9

confederates, since the facts of the crime involved an armed robbery, and further that there was a significant likelihood of destruction or disappearance of the cell phones that had been used by the co-Defendants to plan, carry out, and facilitate subsequent logistical activity after the robbery.

In *Maryland v. Buie*, 110 S.Ct. 1093, 1096 (1990), the Supreme Court held that if the detectives "entry into the basement was lawful, the seizure of the red running suit, which was in plain view and which the officer had probable cause to believe was evidence of a crime, was also lawful under the Fourth Amendment." The phones here, used in the robbery, are similar to the red running suit in *Buie*, and their seizure was lawful under the Fourth Amendment.

Thus, in the instant case, the arrest warrant permitted the officers who met Defendant and three young children at the house door to seize the Defendant, enter the premises and "clear" the house, and in so doing, seize the phones in plain view.

As the Supreme Court stated in *Buie*, recognizing the interest of the officers "to take steps to assure themselves that the house in which a suspect . . . has just been arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack . . . an in-home arrest puts the officer at a disadvantage of being on his adversary's 'turf'." The instant arrest of Defendant at the doorway obviously required the officers to clear the crowded, noisy house, and necessarily to deal with placing the young children with adults, before leaving the premises and taking Defendant to the police station.

Finally, the testimony of S.A. Buyse that he informed the task forces at the pre-arrest briefing of his factual reasons why the cell phones were to be seized as evidence of the crime, supra P.6, supported the raiding officers seizure of the Defendant's cell phones in plain view

10

under the Supreme Court decision in *Whitely v. Warden*, 91 S.Ct. 1031, 1037 (1971): officers called upon to aid other officers in executing arrest warrants are entitled to rely on the information possessed by the officers requesting assistance. Here there is no challenge to the arrest warrant, and the seizure of the phones was proper as incident to the arrest.

Accordingly, Defendant Hamad's Motion to Suppress his telephones seized at his residence at the time of his arrest is DENIED.

DATED: May 16, 2013

s/Paul D. Borman  
PAUL D. BORMAN  
UNITED STATES DISTRICT JUDGE

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 16, 2013.

s/Deborah R. Tofil  
Deborah R. Tofil

11